Good morning. Good morning, Your Honors. May it please the Court, Charlie Sporosi, on behalf of the California Attorney General, I'd like to reserve three minutes for rebuttal. A preliminary injunction is an extraordinary remedy, especially a mandatory injunction that requires the state to take an affirmative action. It was an abuse of discretion to disrupt the status quo by not holding plaintiffs to their high burden. At issue on this appeal are three common-sense commercial sale requirements for new-to-market semi-automatic pistols. Chamber load indicators and magazine disconnect mechanisms prevent accidental discharges, and micro-stamping can be a vital crime gun tracing tool. Each requirement passes constitutional muster, but they must be analyzed separately. The District Court failed to do so. As to chamber load indicators and magazine disconnect mechanisms, plaintiffs cannot dispute that these features can be and have been implemented into semi-automatic pistols. Since the Bolin injunction of the micro-stamping requirement took effect in the next case, so far five new semi-automatic pistols have become available for retail sale with a chamber load indicator and or a magazine disconnect mechanism. All five were existing off-roster models to which manufacturers added one or both of these features. This is in addition to the dozens of pistols on the roster with these features already. Both features are not a, quote, ban on the sale of new semi-automatic pistols. Can I ask a question? There was some note in your brief that there was some legislation under consideration with regard to the micro-stamping. Has that happened? I think Your Honor is referring to Senate Bill 452. I don't know the number. Whatever you refer to. It is currently pending the assembly. It has passed the State Senate. It is before an assembly committee right now. And what that bill would do is, if it passed the assembly and was signed by the governor, it would, effective January 1, 2024, take micro-stamping, that requirement, out of the definition of an unsafe handgun. It would take it out of the roster removal provision, and it would delay the micro-stamping requirement in a different penal code section until July 1, 2027. And is that, just in terms of whether we're going to get a part of this case somewhat mooted out or possibly mooted out before we have a chance to decide, what's the likely timing on that? So the legislature has to decide on that bill by September 14th, and if it passed it, the governor would have to sign it by October 14th or 15th, I think. All right. Thank you. As to the Chamberlain Indicator Magazine disconnect features, Plato's respond that they are allegedly unpopular. The manufacturer's perceptions of popularity do not dictate the scope of the Second Amendment and what safety features that states can require. What are the historical analogs for those two features? For the Chamberlain Indicator Magazine disconnect mechanisms? I would say the best historical analogs that we have are the firearm and gunpowder proving laws from Massachusetts. Also, we call them inspection laws. In Massachusetts, they were adopted, at least the firearm one was adopted in 1805, renewed in 1814. And Massachusetts, at that time, was the leading producer of small arms around the time of 1812. And like the Chamberlain Indicator Magazine disconnect mechanism requirements, those laws also sought to reduce the dangers from firearms that did not operate or not use as intended. What are the limits of this argument? Could the state impose any kind of design specifications for commonly used firearms under this logic, or are there some limits here? I think the limits, at least for here, for using these analogs are about it's not just public safety, but it is also about reducing accidental discharge and reducing the harm that can come from guns when they fire off when the user doesn't expect them to do so. Those are broad rationales, right, safety. Does the state have the power under Bruin to impose design requirements that are either very difficult to meet or commercially infeasible or experimental? So for the Chamberlain Indicator Magazine disconnect mechanism requirements, I don't think those would fall under any of those three categories. And I think that would be plaintiff's burden of the plaintext inquiry to show that their proposed conduct falls within the plaintext of the Second Amendment. I certainly think that what is a design feature or a safety feature that can be added to a handgun, obviously there have to be some limits. But I would say for the Chamberlain Indicator Magazine disconnect mechanism requirements, it's clear that those have been and continue to be incorporated into semiautomatic pistols, and it's also clear that they do help prevent accidental discharges, and at least in the Bolin case and as well as the Rennet case, we presented one study in this case showing that those features can help reduce accidental discharges. And I think it was the Brady amicus brief which went into more detail about statistics on how often accidental discharges can happen, whether it's an experienced gun owner or whether it's a minor or somebody else that has access to that pistol. What, you know, in the case of microstamping, the plaintiffs argue this is commercially infeasible. Let's just, you may disagree with that, but let's just stipulate that that's true. Does the state have the authority to impose a commercially infeasible design requirement? I think that gets closer, obviously, much closer for the plaintiffs to meet their plaintext inquiry burden, but then we would still have the opportunity in the historical inquiry to. Is this really part of the plaintiff's burden, or is it really more your burden under the historical analog part of the inquiry? So the argument about feasibility is the premise for the fact, for the argument that these requirements are a, quote, ban on some amount of pistols. And because that argument about whether it's a ban is the entire premise for their plaintext analysis, I think it is their burden to show that these features are not feasible or not commercially available. One thing that I wondered about is in the Pena case, it appeared that there was a considerably more robust record about the feasibility of the microstamping than there is here. Basically, the state put on nothing. Is that right, about the feasibility of the microstamping? I mean, I understand that the, I mean, the defense, the plaintiff's witness himself said it was technically feasible in the sense some of them work sometimes and it could be done. But on this question of, but he also said, at least as of 2005, that it was not commercially feasible because every manufacturer would have to develop their own way of doing it. And there's, the state put on nothing about that. Is that right? So Pena was a motion for summary judgment? I understand that, but it makes it difficult to evaluate for preliminary injunction purposes. I mean, you have what's in the legislative findings, which aren't all that robust to begin with, and with case law that seems to be fairly hostile to relying on unsubstantiated legislative findings. So what are we supposed to do with it? So a couple points, Your Honor. For Rhena, there was actually, plaintiffs didn't present any evidence about microstamping feasibility. I understand, but in Bowen, you didn't, I understand. But, I mean, it would be a little, technically we might be able to come out differently in the two cases. It seems a little peculiar. Anyway, go ahead. Sure. And the microstamping requirement did recently change as of July 1, 2022, to reduce the requirement from two places to one place. So that requirement really hasn't. But am I correct that the state put on nothing about this? We did not affirmatively put on evidence about the feasibility of microstamping, but I think if you look at the evidence that plaintiffs put on by Mr. Betto, his own testimony and his study actually shows that microstamping is feasible and can be commercially adoptable. Well, he did say it was feasible, but he seemed to say it wasn't, and I don't know what he meant by this, but the state didn't explore it. What did he mean when he said it wasn't commercially feasible? I mean, it meant it would cost money because the manufacturer would have to develop, each one would have, there was no plug-in way to do it. I don't know why that's the standard, but the state didn't put on anything about this. The study at, Mr. Betto's study at 7ER, I'm talking, sorry, I'm talking about the Bowen record right now, but at 7ER 1394, he said that many different implementation strategies for this technology may be possible, and he agreed that in his testimony at, again, in Bolin, 3ER 387, that the kind of microstamping contemplated by California law, which uses alphanumerical characters, is the best chance. Well, suppose we had a blank about that. I mean, suppose, because he actually, whatever his actual study was in 2005, he was not qualified as an expert, and there didn't, he didn't actually, although he said that it is now not feasible, there's nothing in the record that suggests that he had any kind of study after 2005. So suppose we just washed him out, too, and we had a zero. Then what would we do with it? They didn't have any proof that it wasn't technologically feasible. You don't have any proof that it was. But, in fact, it's not happening. One thing I did remember that we did put on is that the fire manufacturers of the National Shooting Sports Foundation before the California Supreme Court in 2018 did acknowledge that microstamping in one place on a firing pin is feasible, and that is the current requirement. But isn't, I mean, just to follow up on this line of questioning, isn't all of this the state's burden if this conduct is covered by the plain text of the Second Amendment? Because at that point you have to show the how and the why under this historical analogical reasoning test. And it seems to me that once we've crossed the threshold and once there's a determination that the Second Amendment protects this conduct presumptively, then it was the state's burden to come forward and build a record on this point, and there's not much of one here. So for the historical analogs for microstamping, I think we have pointed to sufficient analogs. What are they? So I think it's the analogs that were covered in the district court case in Holton as well as this court's case in Teixeira. Specifically, there was a 1631 Virginia colonial law that required all firearms that came into the colony be registered. There was a Connecticut and also Virginia law that restricted where firearms could be sold, to whom firearms could be sold. And all these analogs are just part of the tradition of the government controlling commercial access or the commercial market for firearms to ensure. But this isn't about who can buy it. It's about ensuring that guns are not used for illicit purposes, and it's about tracing firearms. And I think the prior questions about feasibility and, I guess, the paucity of the evidence there, I think it's important that any ruling about microstamping here is limited to the record before this court in this preliminary posture because the record of microstamping can be developed further below. And there are other states that do have microstamping requirements that are. There are? Which other states? New York and New Jersey. They actually have it, or they have it prospectively, or they might have it someday, or what? They have not gone into effect yet. Both states are conducting feasibility studies as we speak, and I don't know the release dates of those. I think New Jersey recently announced that there should be coming out. On the one hand, we often in regulation, I mean, if something is physically feasible, which this appears to be, there was a lot of complaints about airbags, and presumably no manufacturer would have done it if they weren't forced to do it. Airbags are a lot more expensive and complicated, and presumably every manufacturer had to do it somewhat differently. So it is somewhat, you know, bizarre that if something is physically feasible and not expensive, the fact that you might have to adapt it to your particular gun is a reason that proves that it can't be done, rather than you'd rather not do it. But the problem is that we're dealing with the Second Amendment. You know, there's nothing in the Constitution that protects automobiles, or maybe there is. I don't know. Somebody tried to pay at Auto Reveals. I think there'd be a problem. So it's disturbing, but to have this whole, I mean, my problem is that to have this whole case hung up on this problem because as a result of it, it appears that the manufacturers are not putting, you say there are a couple new guns added, but they can't because of the micro-stamping, right? They were added because the micro-stamping requirement is enjoined under Bolin. Oh, really? So the five new pistols that were added. I see. So that's a demonstration that if the micro-stamping was gone, there'd be more guns on the roster. I think the, yes, those were answers, yes, Your Honor. I think the micro-stamp, because manufacturers have essentially boycotted and chosen not to comply with the micro-stamping requirement since 2013, there would have been. So I hope in the next argument that you will concentrate on the other two officials. I'd be happy to, Your Honor. I think I'm coming back up here a couple more times. Yeah, we'll see you again shortly, but we'll give you two minutes for rebuttal, and then you'll obviously have an opportunity to address all these issues further in the next case. Thank you, Your Honor. Good morning, Your Honors. Bradley Binbrook for the plaintiffs' appellees. May it please the Court. California's Unsafe Handgun Act is an extreme outlier among modern firearms regulation and has no analog in history. As the prior discussion just showed. Isn't it true that at the time of the founding, basically most guns were long guns and you had to put gunpowder in the gun and push it with a ramrod and have a little ball, and I gather that was even true of Mahler guns. So this problem kind of didn't exist. So what do we do with that? We're supposed to just stop history and say because the problem didn't exist, we're simply, there's no analog? Well, I'd say I have two responses to that, Your Honor. Heller conclusively responds to the observation that guns were very different at the founding. It says that the Second Amendment does cover all guns, all arms in their current manifestation. And the. . . But we can't productively look at history for something that wasn't there. Well, so. . . So we look for analogs, and Bruin is very specific about how to do that. So it would be helpful to me, and let's stay away for the moment from the micro-stamping. Let's talk about the other two. Sure. Well, so, Your Honor, the other response to Your Honor's question, Your Honor used the word problem. The problem, as Bruin categorizes it, is, and as the state categorizes it, is accidental discharge, accidents with firearms. That existed at the founding. And so the analysis under Bruin in the history analysis is. . . And insofar as it existed, there were regulations, quite severe ones, about gunpowder and leaving the gunpowder in the gun and so on. There were regulations. Well, Your Honor, we respectfully disagree with that characterization, as the district court found the burden imposed by the proving law and the gunpowder inspection laws. . . Well, you characterize the proving laws as being just about whether the guns work as expected, but my understanding is that they have to have standards. They are proving it against something, and there were standards in those statutes about how far there was supposed to fire or how there was supposed to fire and so on. So there were standards. Absolutely. There were objective standards that if a gun worked as it's supposed to work, it would be stamped and available for sale. Well, it worked as it was regulated to work, had the characteristics that the government decided it had to have. And those were normal operation of guns in common use at the time, firing a certain number of feet. Right. These regulations. . . And if some manufacturer said, well, I'm sorry, I don't want to have guns fire that long. I want to have my guns that are going to fire, not fire as far. That's the guns I want to make. And they'd say, well, too bad, right? These regulations are totally different in kind because they do not affect normal. . . Well, they do affect the normal operation in the sense that it makes them less easy to use, but they don't. . . They impose. . . Seek to impose features that are not in common use, and that's just completely and wholly different than the proving law. I don't know if you have any idea whether they were in common use or not. I don't know how long guns were supposed to shoot at that time. But here, I mean, I find it very hard to understand what the burden is. Your client's position is we get to buy any model gun we feel like buying. Even if telling us where the chamber is doesn't change anything about the way we use it, we don't want it for some reason. So, Your Honor, the recent case in Teeter v. Hawaii forecloses that argument. Hawaii banned a subset of knives. Well, first of all, Teeter is not final in this court. Heller foreclosed that argument by saying, addressing specifically that the state can't point to the availability of one set of guns to justify banning another set of guns. Well, that's a difference between handguns and long guns. This is a difference. . . I don't know what the difference is. It's a difference between a gun that tells you that there's a bullet in the chamber and one that tells you there's not a bullet in the chamber, and I just don't want to know if there's a bullet in the chamber. I mean, that just seems totally irrational. I mean, not even believable. Your Honor, the guns that are not available for sale are in common use throughout the United States. There's no dispute about it. Under the textual analysis that Bruin requires, the handguns are arms that are not being available for sale. There's no dispute that there's an auxiliary right to purchase them. There's no dispute that the plaintiffs are among the people. That is the end of the inquiry under the textual analysis. Is your ultimate position that no safety regulations for guns are valid? Well, that's certainly not the import of this case and not the import of our argument. No, but I'm asking for the import of your position. If somebody says, I'm sorry, I want to buy a gun, that if you drop it, it can shoot, and I get to buy that gun if I want to. Well, Your Honor, respectfully, it's hard to imagine a plaintiff bringing that sort of case. It's hard for me to imagine a plaintiff bringing a case saying I don't want to know if there's a bullet in the chamber. And I would respectfully submit that that plaintiff might have a very hard time with the proving laws. How do you characterize the burden differential between the proving laws and the gunpowder storage laws on the one hand and the burden here? So on the proving law, again, in terms of the scope, well, first of all, on the scope, it did not require any features. That's an important point. All ordinary guns were eligible for sale if they passed the firing test. Here, guns that are banned can pass 200 tests, but they still can't be sold. And the Massachusetts proving law, which is the primary example, had a very limited scope. It didn't even apply to the Springfield Armory, the biggest manufacturer in Massachusetts, and it didn't apply to out-of-state guns. There does seem to be an absence of evidence of design rules back at the founding. Is that dispositive? I think so, Your Honor. Under the language in Bruin that says if a societal problem has existed since the founding and at the founding they either didn't address it or addressed it in materially different ways, and here we're talking about essentially firearm safety, accidents from guns, if that problem has persisted throughout and they either didn't address it or addressed it in materially different ways, that's the answer. Does it matter if the technology has changed over time? Because I think the argument on the other side is that the weaponry here is a higher level of technology and capability. So Bruin accounts for that. It does, and they're leaning very heavily on the language in Bruin that says in the instance of technological change, a more nuanced approach would apply. And we've briefed it as if that applies. We submit it doesn't, and the Brady amicus brief is a good indication of that. They say that the CLI and MDM technology has existed for over 100 years, and yet there has been no jurisdiction until the last few years to impose such a requirement. Now, of course, I hasten to add that in the early 1900s that wouldn't be that's too late to come along anyway, but nevertheless it's worth observing that while the state leans very heavily on the argument that this is new technology that we've got to completely change our approach, the Brady brief undermines that. How do you address the point that was made about the number of pistols that have been submitted and approved with the CLI and MDM, the original 32, and now this additional, I think it was five? Your Honor, that kind of gets to the feasibility issue. There could be 50 added, 75 added. The feasibility question, frankly, I believe is a red herring. It does not relate to the text argument. That's one of their textual arguments. But the feasibility concept ignores that even if a substantial number of these guns adopted the technology, there are still substantial numbers that don't have the technology that's in common use, and there's no basis under the Second Amendment for banning those. We're not anywhere near. Maybe in 50 years we'd be to the point where the vast, vast majority have all these features, but that's simply not the world as it exists today. So if I could say one point, a few points about PENA. There's a lot of discussion in the state's briefs about PENA, and it really animates a lot of the feasibility discussion, the alternative guns analysis. I have to stress that because of Bruin, PENA really has no application here. The closest PENA got to approximating the kind of test that Bruin calls for was its statement, we assume without deciding that the conduct protected by the Second Amendment has been burdened. That's the closest they got to something that Bruin requires. The entire rest of the opinion is, one, determining whether intermediate scrutiny applies, and, two, applying intermediate scrutiny. But, of course, Bruin totally abrogates that. Counsel? Yes. In your view, has PENA been overruled? Yes. Yes, absolutely. Every single word in PENA has been overruled, in your view. Well, the background section where it describes the law is not necessarily overruled, but the basis for reaching the result in PENA is totally incompatible with Bruin and cannot be used. And, therefore, for example, the state cannot point, should not have pointed to the statement at the beginning of the opinion in PENA, quote, we reject plaintiff's claim that they have a constitutional right to purchase a particular handgun. That is the statement of the result of the PENA court's intermediate scrutiny analysis. It obviously has no bearing now. And it's worth illustrating another example. At 982 in PENA, it says that micro-stamping has not been implemented because manufacturers, quote, have chosen not to, and that has no relevance after Bruin, but Why does it have no relevance? Because it followed up that statement a few sentences later that said, that begs the question. I would think it has no relevance because it's a factual statement. It would have to be, that depends on that record, and it would matter. This is a different case with a different record, and there's no collateral estoppel, but certainly relevant. Well, it's not relevant to the text. Not because of Bruin, it doesn't have relevance. It's not relevant to the text. Well, Bruin says it's text and then history. Well, it doesn't text. Do you think that text with regard to the first prong doesn't include text as interpreted in Heller, i.e., regulations that infringe the right to bear arms so that, for purposes of self-defense, so at least in the first prong, there should be some analysis of whether this restriction restricts the right to bear arms for purposes of self-defense, right? And if the conclusion is, knowing whether there's a bullet in the chamber does not restrict your right to self-defense, then it's out on prong one, no? Your Honor, the test is simply a facial test. Is our arms being restricted? And these are indisputably arms that are not available for self-defense. And your conclusion is that the right to bear arms does not include the right to bear any, any gun you feel like it. And there, as long as you can buy a lot of guns for purposes of self-defense, that would be a prong one determination. Well, Heller addresses Your Honor's concern. Well, it doesn't because there's a huge difference between I'm not going to have any handgun and I can have any old handgun, any handgun I want, even if it's dangerous. It says that the limitation on the Second Amendment right is, the A limitation on the Second Amendment right is that guns in common use are covered by the scope of the Second Amendment. Your Honor asked about buying any weapon you want. Heller addressed it and said the dangerous and unusual exception, historically, is an exception. So we're not here saying we should be able to buy a machine gun. We're talking about ordinary guns that are available in 48 other states that many millions of people possess and use because they work well. Can I ask just before you sit down about just the reach of the argument in terms of whether there's any ability for a state to impose additional design features, design requirements that other states don't have. Do you think a state has that ability under Bruin? I'm talking any ability, right? Because once you change the design feature in one state, there's then going to be models of firearms that are available in other states that aren't quite the same and that somebody wouldn't be able to purchase if the design is different. I don't think I can stand here and categorically say there's no design feature that can be lawfully imposed under Bruin. All I can say is that these design features that are being imposed clearly are not consistent with Bruin or the historical scope of the Second Amendment. Even if they're, I mean, I gather that there are plenty of guns that do, let's just check with the chamber designator for the moment. There are, I gather, a large number of guns that these people can purchase, hundreds in California even, ones that were older models and a good number of new models. And presumably if the micro-stamping weren't there, there'll be more. That's not good enough? The fact that there are hundreds of guns they can purchase? Your Honor, we addressed that in our brief. I know, but I want to know why. I mean, it comes down to the notion that they can buy any gun they feel like. I mean, if they want a gun that's blue instead of one that's red and it doesn't have the chamber feature, they have a right to buy it. Is that your position? Well, that's not the import of the blue-red distinction. It's not the import of the case or the declarations we've submitted. We submitted declarations explaining some of the reasons why people might want other types of models that are banned. But we didn't have to do that. The fact is they are banned in huge numbers, and therefore, And all of this is skewed by the micro-stamping issue. Pardon me? All of this is skewed by the micro-stamping issue. Respectfully. You choose to lump all three together, but if we backed out the micro-stamping, what's the problem? It's a huge problem because there are 1,000-plus models of guns available throughout the United States that don't have either of the MDM or CLI features. So the problem persists. For the ones that have been submitted, the 35 plus or 32 plus 5, do those otherwise have the modern features that are available elsewhere? In other words, does the addition of the CLI and MDM somehow affect any of the other features that are now part of a more modern pistol? Well, the record isn't really, well, what does your honor mean by affect? Well, what I'm saying is the following. There's a 10-year gap in time, right, between when something was last put on the roster. Again, take aside these 35 for a second. And my understanding from the record is that there's been changes to gun technology over the last 10 years, just like there would be to a car or to a TV. And so there's some new things that people might want in there. For the 35 plus 5 or 32 plus 5 models that have been approved on the California roster that have the CLI and the MDM, do those otherwise have the modern features that are available elsewhere? Your honor, that hasn't been addressed. My understanding is it probably do,  I would just close, your honor, well, with two points. The mandatory injunction point that counsel raised, we did address that in the brief. But secondly, firearm technology has been. Counsel, could you address it here? Why is this not a mandatory injunction? Well, at a big picture level, their argument is, well, this is a mandatory injunction because now we have to receive all these guns and start testing them if the injunction holds, which we wouldn't have otherwise had to do. Well, it cannot be the case that the state can avoid an injunction by saying, well, we should be able to keep doing this unconstitutional, enforcing this unconstitutional law over here because compliance with the law as we've written it would have to do some ministerial tasks. What is the definition of a mandatory injunction? Well, I think at a big picture level, it's an injunction that. What's the legal definition of a mandatory injunction? An injunction that requires certain acts, I believe, is probably the best answer. It requires the state to do something that it would not otherwise have to do. Does this injunction meet that definition? I don't think it does because the state of the law has to be taken as a given, and the state has enacted statutes that said in certain circumstances we do this. So treating gun models that are currently banned as being eligible for sale, being lumped in with all the other guns, cannot fairly be characterized as a mandatory injunction, that marginal ministerial work. Counsel, if we disagree with you and say that this is a mandatory injunction, did the district court properly analyze the winter factors in the context of granting a mandatory injunction? I believe it did, Your Honor. It did address each of the winter factors. At the heightened standard that a mandatory injunction requires? Well, in fairness, the district court did not agree that it was a mandatory injunction. If the district court did not see it as a mandatory injunction, did it analyze it at the heightened standard that's required for a mandatory injunction? Your Honor, I can't add anything to what we've addressed in the brief. All right. Thank you. We've let you go well over your time, Mr. Benbrook, and we're going to be hearing argument in a similar matter next. So I don't know if you have a very quick concluding remark, and then we'll ask to hear from rebuttal. Well, I guess the one note is the various discussions about the evidence in the Boland case, that's a different case. So that's why I didn't respond to that. I'll let my able colleague. Well, just in that regard, the record in this case says nothing about the micro-stamping feasibility. Is that right? Nothing about the feasibility. I mean, there is declaration that no guns have the micro-stamping technology. Well, yes, but there's nothing about the feasibility. Nothing. I don't know that the State certainly talked about the feasibility. But, again, feasibility, I'll just reiterate and close, the feasibility issue and the argument that this law isn't causing the problem because manufacturers are just not complying is, frankly, Orwellian. And it assumes away the whole ballgame that the State has the ability to impose feature requirements, and by doing so, banning guns in common use. That's the entire point of the law here. Okay. We're going to ask now to hear rebuttal from your opposing counsel. Thank you, Mr. Benbrook. Thank you. If your honors don't mind, I'll start with the mandatory injunction point. Our view of what is a mandatory injunction is something that requires the State to take affirmative action, and that's something that disrupts the status quo. Neither the district court in Brenna or in Boland actually addressed this issue at all, even though we did raise it in our briefing before the district court. And because neither district court actually addressed whether it was a mandatory injunction, neither district court even applied that analysis or held plaintiffs to the higher burden, that they need to show extreme or very serious damage, and that they need to show that the law and facts are clearly in their favor. And I think we pointed to American Freedom Defense Initiative as an example of a mandatory injunction where a public transit agency was required to publish an ad on a bus when that ad did not comply with its requirements. But here the injunction is simply don't enforce the law, no. Don't do something. The Boland injunction says the State or the Department of Justice cannot otherwise prevent the retail sale of semi-automatic pistols without the three features that are challenged here, which means that the Department of Justice would have to allow the retail sale of any semi-automatic pistol that complies with the other parts of the Unsafe Handgun Act. But allowing the sale just means don't stop it. No, it means, at least for how this law works, it means that the department has to receive those pistols from the lab. It has to receive the lab report. It has to review the gun. It has to review the lab report to ensure that all the requirements are indeed met. It has to collect the listing fee. It has to notify dealers that the gun is— That's not the result of not enforcing this law. That's the result of the existing law that otherwise exists. That is a result of these requirements not being in effect. Is that— Right. So therefore, what kicks in is what was there before, which is this regime where you have to have—to get on the roster, you have to meet certain requirements. But as far as this injunction is concerned, all it's doing is lifting, is eliminating a barrier, and we're back to the status quo, which is this is how you do it. Well, it's actually changing the status quo even from, let's say, just with the microstamping part enjoined and not Chamberlain Indicator Magazine Disconnect mechanism enjoined. Is there anything else you want to talk about? There are quite a few things I would like to talk about. I wonder, just to make a suggestion, because you're about to get back up here in Boland and speak on some of these, frankly, identical issues. I wonder whether we should conclude our argument in this case. And, Judge Berzon, I don't know if you'd like to take a short recess. Yes, that would be good. So why don't we do that. We'll take a—go ahead, Judge Rollins, and I apologize. I wanted to ask if, under the injunction, is the state required to register firearms on the roster that would not ordinarily be registered on the roster? Yes, Your Honor. Thank you. Or add them to the roster, yes. That's correct. Okay. I want to thank both counsel for the briefing argument. In this case, we're going to go ahead and submit the case of Renna v. Bonta. The court's going to take a five-minute recess, and we'll then hear argument in the last case. Thank you. All rise. This court stands in recess for five minutes.
judges: BERZON, RAWLINSON, BRESS